# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    PLAINTIFF,

v.

WILLIE PAYMON,

    DEFENDANT.
_____/

CASE NO. 07-20196

ARTHUR J. TARNOW
UNITED STATES DISTRICT JUDGE

## ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [D/E # 18]

The issue before the Court is Defendant's Motion to Suppress Evidence based on an allegedly defective search warrant. The execution of the warrant led to evidence that directly resulted in Defendant's felon in possession of a firearm charge. On July 10, 2007, this Court heard oral argument and requested further briefing. Defendant's Motion is **GRANTED** for the reasons stated below.

### I.  Background

Drug Enforcement Administration["DEA"] Special Agent Ted Dosch wrote the search warrant's supporting affidavit that eventually led to the discovery of a firearm at Defendant Paymon's residence. The supporting affidavit outlines general information about the affiant, Special Agent Dosch, and his experiences investigating drug trafficking. The affidavit then lists the residences to be searched as 23500 Beech Road in Southfield, Michigan and 100 Riverfront Drive, Apt. 2201 in Detroit Michigan. The affidavit also counts the DEA Detroit Divisional Office, the United States Customs Services, Border Patrol, the Bureau of Alcohol, Tobacco and Firearms ["ATF"] and the Royal Canadian Mounted Police as partners in the long running, since 1999, investigation of the alleged Paymon criminal organization.

In addition to general information, the affidavit includes information from DEA

informants concerning Paymon and his connections to drug trafficking. In 1992, informant number one [hereinafter "DEA-1"] began to sell drugs at the street level on behalf of Willie Paymon. Beginning in 1996, DEA-1 began selling drugs on a consignment basis for Defendant Paymon and his organization which included his now deceased brother Gary, Anthony Ellis and Joe Cole. According to DEA-1, the organization used Joe Cole's trucking company to transport drugs and DEA-1 would receive shipments of 800 to 1500 lbs of marijuana on behalf of Paymon. In the late 1990's, Paymon and DEA-1 invested in a large marijuana shipment worth over $800,000 that was stopped and seized in Indiana. DEA-1 also listed a number of associates of the criminal enterprise who are allegedly connected to Paymon and have been arrested on drug charges. DEA-1 also provided information linking the home in Southfield as being a stash house equipped with fake walls for drug proceeds of the criminal enterprise.

Another informant ["DEA-2"] gave information to the DEA in December of 2006 about Paymon's drug importation activities from California. DEA-2 stated that some of Defendant's alleged associates were "currently," *i.e.*, as of December 2006, distributing marijuana from Canada to Detroit.

A third informant ["DEA-3"] gave information in 2005 about marijuana trafficking activities of Cole and Williams, alleged associates of Paymon. DEA-3 stated that Williams "engaged in trafficking" with Defendant.

Another informant ["DEA-4"] provided the government with information concerning Corwyn Baldwin, an alleged associate of Defendant, who was caught in Arizona with over $70,000. According to the informant, Baldwin was still employed by Paymon as a drug trafficker as of March 2007.

Sometime during March 2007, an anonymous caller spoke to an ATF agent. The caller claimed to have personal knowledge that Paymon used hidden compartments within boats, recreational vehicles, and his residences to store large amounts of money and marijuana. The caller also said that Paymon had been involved in several murders, had a residence in Canada,

and was currently residing in the Riverfront Towers apartment complex with his wife.

During March 2007, the search warrant affiant reviewed the public database records and identified 100 Riverfront Drive, Apt. 2201, Detroit, as a residence for Paymon. He then obtained records through subpoena for the apartment which listed Willie Paymon and his wife as the renters, occupants and utility subscribers since February 2006.

Beginning in November 2006 and continuing until March 19, 2007, surveillance was conducted at the Southfield residence. This activity showed that many of Paymon's associates, who had been convicted of drug offenses, either resided at or visited the house.

The Canadian Royal Mounted Police also investigated Paymon during the periods of 2002-2003 and again in late 2006. This investigation included activities of many of Paymon's associates but focused on an alleged Canadian drug trafficker. The investigations led to discovering that Defendant's company purchased a Windsor residence. Defendant Paymon was also involved in suspicious travel, including an illegal entry into Canada from the United States by boat in late 2006.

The search warrant affiant concluded that the DEA's confidential sources were credible and reliable. The sources provided information relative to three large seizures of currency from couriers of the Paymon organization which were corroborated by law enforcement records. DEA-1 had personal observations of large sums of drug proceeds at the Southfield house. The investigation revealed that vehicles known to be utilized by Paymon and money couriers of Paymon frequented the Southfield house. The Canadian police surveillance showed a pattern of suspicious and international travel consistent with drug trafficking. The DEA-4 information demonstrated that an alleged criminal of associate of Defendant Paymon was involved in the criminal conspiracy as late as March 2007 and that Paymon in connection with the drug enterprise used traps within boats, RVs and houses.

Additionally, the records obtained from Riverfront Apartments and public databases showed that Willie Paymon resided at the 100 Riverfront Tower, Apt. 2201. As a result, the

affiant believed that the circumstances established that a search of Paymon's residences would unveil drug trafficking evidence despite the fact that there was no evidence either from surveillance or informants linking Paymon's Riverfront Apartment to drug trafficking.

Based on an affidavit provided by Drug Enforcement Agency ["DEA"] Special Agent Edward Dosch, a magistrate judge signed the application for a search warrant of both the Southfield and Detroit residences on March 26, 2007.

Two days later, agents from both the DEA and Alcohol, Tobacco and Firearms ["ATF"] executed the search warrant at the two homes. The searches came after an over 7-year investigation into a drug trafficking organization allegedly run by Defendant Paymon. The search at 100 Riverfront Tower, Apt. # 2201 in Detroit, where Paymon was living at the time, resulted in the discovery of a 9mm, semi-automatic pistol and $7,000 cash. The search of his Southfield residence located at 23500 Beach Road resulted in the discovery of $12,000 in cash.

As a result of the discovery of the pistol, Defendant was charged with felon in possession of a firearm in violation of 18 U.S.C. § 922.

Defendant now challenges the legality of the search of his Detroit residence arguing that the search warrants did not possess the requisite probable cause. Defendant admits that the supporting affidavit's information at one time may have supported a probable cause finding for the issuance of a search warrant in relation to his Southfield residence. However, he argues, the information relied upon by the magistrate was for the most part several years old. The only evidence that updated this stale evidence was that Defendant was seen in a boat in Canada, running with its lights off and the fact that Defendant's vehicle was linked to the vehicle of a known Canadian drug trafficker.

In addition to the stale evidence, the search warrant failed to demonstrate a fair probability that contraband or evidence of a crime would be found at Defendant's Riverfront Towers residence. Although the affidavit may have connected alleged drug trafficking activity to Paymon's Southfield address, the supporting affidavit failed to create any nexus of criminal

activity to Paymon's Riverfront Tower address in Detroit.

## II.     Probable Cause

A basic principle of the Fourth Amendment is that for a search warrant to issue there must be probable cause, *i.e.* whether there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In order to establish probable cause, "there must... be a nexus between the place searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004)(*en banc*).

> The critical element in a reasonable search is not that the owner of property is suspected of crime, but that there is a reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought.

*Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). An officer's belief that there is a sufficient nexus between the suspected crime and the place to be searched is unreasonable when evidence in the affidavit connecting the crime to the residence is "so vague as to be conclusory or meaningless." *United States v. Frazier*, 423 F.3d 526, 536 (6th Cir. 2005) (citation omitted).

In reviewing a magistrate's determination of probable cause, the court must determine whether under the totality circumstances the magistrate had a substantial basis for concluding that a search would uncover wrong doing. *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006). Review of a magistrate's decision as to probable cause is limited to the "four-corners of the affidavit." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006).

Defendant claims that search of his Riverfront Towers apartment, which led to the discovery of a handgun, was unconstitutional under the Fourth Amendment because the search warrant and its supporting affidavit lacked the requisite probable cause. Although Defendant admits that the supporting information may have at one time been enough to support a finding of probable cause for the Southfield address, the supporting affidavit's information did not support a finding of probable cause at the time it was presented to the magistrate because it was "stale."

In *Sgro v. U.S.*, the Supreme Court noted that "it is manifest that the proof must be a fact

so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." 287 U.S. 206, 211 (1932). The Sixth Circuit has stated that "the function of a staleness test in the search warrant context is not to create an arbitrary time limitation." *United States v. Canan*, 48 F.3d 954, 958-959 (6th Cir. 1995).

In terms of determining whether evidence is stale, the measure is not done solely by counting days. The court should also consider the character of the crime, the criminal, the thing to be seized and the place to be searched. *United States v. Spike*, 158 F.3d 913, 923 (6th Cir. 1998).In *U.S. v. Button*, a search warrant issued on an affidavit that stated that the defendant possessed narcotics "over the past six months." 653 F.2d 319, 324 (8th Cir. 1981). In finding the warrant defective, the court noted that inherent nature of substances like marijuana can be easily concealed and moved about, thereby making the timing of the information important. *Id* at 325.

However, when an affidavit establishes an activity that is "of a protracted and continuous nature, that the passage of time becomes less significant." *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972). "Information which demonstrates a chain of related events covering a broad span of time continuing to the current period may furnish a most reliable indicia of present activity, thereby clearly demonstrating that probable cause exists for the order to intrude." *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988).

The Government contends that the information provided in the supporting affidavit was enough to support a the magistrate's finding of probable cause for both residences because the evidence demonstrated an ongoing and continual drug activity. In *United States v. Newton*, the Sixth Circuit determined that in cases where there is detailed information to suspect that an individual is a drug dealer with "continuing and ongoing operations," both staleness and the lack of a direct known link between the criminal activity and the residence become less of an issue. 389 F.3d 631, 635-36 (6th Cir. 2004).

In terms of the nexus between criminal activity and the Riverfront residence, the Government relies on a line of cases that seem to announce that once probable cause exists to

arrest someone on suspicion of drug trafficking, there is also probable cause to search that person's residence without regard to whether there is any nexus to criminal activity at the location because "[i]n the case of drug dealers, evidence is likely to be found where the dealers live." *Newton*, 389 F.3d at 635 (quoting *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998)); see also *United States v. Jones*, 159 F.3d 969 (6th Cir. 1998); *United States v. Caicedo*, 85 F.3d 1184 (6th Cir. 1996); *United States v. Miggins*, 302 F.3d 384 (6th Cir. 202); and *United States v. Blair*, 214 F.3d 690 (6th Cir. 2000).

However, the cases cited by the government are distinguishable from the case at hand. In determining whether probable cause exists to arrest or search a residence, the magistrate and the reviewing judge must look to the totality of the circumstances surrounding the search warrant affidavit. *Gates*, 462 U.S. at 238. Both the staleness of the information and lack of any link between wrongdoing and the place to be searched are components of those circumstances. The staler the information relied upon and the lack of a nexus between the evidence sought and the place to be searched, both negatively affect the probability of finding contraband or evidence of a crime.

In terms of staleness, although the investigation was ongoing, the bulk of the investigation occurred prior to 2007. DEA-1 distributed marijuana on behalf of the criminal enterprise until 1998, however his knowledge of the any criminal operation after 2000 is not contained within the affidavit. DEA-3 gave information about alleged associates of Paymon and their drug trafficking in late 2004 and early 2005. DEA-4 provided information about the alleged transporting of drugs by the criminal organization in a motor home during 1999 and 2000. The most up to date information given by an informant comes from DEA-2 who provided information about Paymon and his organization's alleged drug trafficking from California as well as alleged associates drug trafficking from Canada as late as December 2006.

An anonymous caller stated in March of 2007 that Paymon used hidden compartments in boats, cars and residences to store money and marijuana.

Surveillance was conducted from November of 2006 through March of 2007 at the Southfield address only. Although known drug associates were present at the Southfield, the affidavit does not outline either drug trafficking or suspicious behavior other than the presence of certain individuals.

The stale evidence provided by the informants was minimally refreshed by the information obtained by the Royal Canadian Mounted Police investigation. Their investigation did lead to the discovery of Paymon's illegal entry into the United States on December 2006. Although this may suggest and reinforce allegations of international drug trafficking in the end again no drugs were found and Paymon was fined and released.

In regards to a nexus between contraband or evidence of a crime and Paymon's Riverfront residence, the Government relies on the fact that the apartment complex has a boat dock which could be used by Paymon to make his illegal entries into Canada. This mere speculation cannot be defined as a nexus. The government failed to present any testimonial information from any informant that Paymon used the residence to store or sell marijuana or to store his proceeds from selling marijuana. There is simply no evidence connecting the residence to criminal activity other than the generalization that drug traffickers often use their residence to either store drugs or money.

The government points to a line of cases that rely on the abstraction that if someone is involved in drug trafficking, there is probable cause to search his residence because drug dealers tend to keep contraband or evidence of crimes in their residence. In *Newton*, the Sixth Circuit Court of Appeals found that the searches of the defendant's four listed addresses were supported by probable cause despite the lack of a nexus because detailed evidence of Newton's drug operations was provided to the state judge. 389 F.3d at 636. In *Miggins*, the finding of probable cause to search defendant's actual residence was upheld by the Sixth Circuit even though defendant signed for a controlled shipment of drugs at a separate residence. 302 F.3d at 393. In *Jones*, the search warrant used to search defendant's residence was upheld despite the fact that

the control buys only took place in the driveway as opposed to inside the house. 159 F.3d at 975. In *Caicedo*, after being arrested for possessing blocks of cocaine, a search warrant was properly issued to search defendant's residence despite the fact that there was no evidence linking the residence to drug trafficking. 85 F.3d at 1192-93.

Although it may be argued that the supporting affidavit included detailed evidence involving Paymon's alleged drug trafficking, there is a key difference between this case and the line of cases cited by the government. In each of the cases, there was direct evidence prior to the search warrants issuing that the suspect was trafficking in drugs that directly led to the defendant's arrest. In *Newton*, the defendant was arrested for driving to a rural residence and loading thirty-three bundles of marijuana into his car, afterwards the search took place. In *Miggins*, the defendant accepted a controlled package of cocaine delivered from a police officer posing as a Federal Express driver. In *Jones*, the defendant sold drugs to a confidential informant at least six times in the driveway of the residence. In *Caicedo*, the defendant was arrested after a legal search of his backpack turned up bricks of cocaine.

Unlike these cases, Paymon was not arrested for drug possession nor was their sufficient evidence to arrest Paymon on drug charges prior to the searches. Moreover, the only evidence contained within the affidavit placing Paymon in the presence of drugs was stale. Had the Government established through fresh evidence that Paymon had direct contact with drug trafficking, the lack of a nexus between his Riverfront Towers and the probability of finding contraband would not be at issue. Here the supporting affidavit was defective because the lack of a nexus was not alleviated by fresh information that Defendant was a drug trafficker. Under the totality of the circumstances test, this Court finds that the affidavit failed to provide a sufficient basis to find probable cause for a warrant to search Paymon's Riverfront Towers residence.

## III. Good Faith

Defendant also argues that *Leon's* good faith rule should not apply.

> *United States v. Leon* modified the exclusionary rule so as not to bar from admission evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." 468 U.S. 897, 905 (1984). Where an officer's reliance on a warrant is objectively reasonable, the Supreme Court held, no additional deterrent effect will be achieved through the exclusion from evidence of the fruits of that search. *See id*. at 922. However, the good-faith exception is inapposite in four situations: (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his judicial role and failed to act in a neutral and detached fashion, serving merely as a rubber stamp for the police; (3) where the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient. *See id. at 923*.

*United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006).

In *Hython*, the Sixth Circuit held that where the affidavit lacked any reference to temporal proximity as to a drug sale by a particular defendant from a particular house, the affidavit would be so lacking in *indica* of probable cause as to render official belief in its existence entirely unreasonable.

In arguing against the application of the good faith rule of *Leon*, Defendant relies on the third exception: that the affidavit was so lacking in probable cause that it caused the officer's reliance on the search warrant to be objectively unreasonable. Defendant contends the logic of *Hython* should apply because the length of time is as prolonged as in the instant case and no evidence of a continuing crime or nexus to Riverfront was ever established to the magistrate. The government disagrees.

In *United States v. Laughton*, following a tip from a confidential informant, the officer arranged and observed two controlled buys at the defendant's home under surveillance using the

confidential informant. *United States v. Laughton*, 409 F.3d 744, 746 (6th Cir. 2005). Soon thereafter, the officer swore an affidavit in an application for a warrant to search the residence. *Id*. The affidavit discussed the officers training, that the officer worked with a confidential informant who twice purchased meth in the last 48 hours and that affiant observed the controlled purchase. *Id*. at 746-47. The affidavit however failed to include that the confidential informant bought the drugs from the defendant at the home, that the confidential informant bought the drugs from the defendant, or that the police observed the confidential informant buy the drugs from the home.

The district court found that because the supporting affidavit failed to indicate any connection between the defendant and the address given or between the defendant and any of the criminal activity that occurred, the search warrant affidavit failed to provide the required nexus between the place to be searched and the evidence sought. However, the district court determined that the good faith rule of *Leon* applied because it was not a "bare bones" affidavit. *Id*. at 749.

The Sixth Circuit disagreed with the district court's conclusion that *Leon* applied. Noting that the good faith exception often applied in cases where probable cause did not exist because the search warranted lacked a nexus between criminal activity, *Laughton* was not to "be added to this list." *Id*. The reason being that the prior cases there was "some modicum of evidence, however slight, to connect the criminal activity described in the affidavit to the place to be searched." *Id*.

Similar to *Laughton* the application simply listed the address of Paymon's premises to be searched, a summary of the Special Agent's professional experience, and the speculation that Paymon used the dock, not even his home, to launch his boat to illegally enter Canada. There is no modicum of evidence to connect the alleged criminal activity described in the affidavit to Paymon's Riverfront Towers other than mere speculation that Paymon may have used the dock at the apartment complex to make his illegal entries into Canada. The affidavit, although

detailed in terms of criminality and connections to the Southfield home, lacked the required nexus between criminality and the Riverfront address to such a degree to make a well trained officer would not be able to objectively and reasonably believe that the warrant was sufficient. Thus, *Leon's* good faith exception does not apply.

### IV.     Conclusion

Because the search of Paymon's Riverfront Towers residence lacked probable cause and because the "good faith rule" does not apply,

**IT IS HEREBY ORDERED** that Defendant's Motion to Suppress is **GRANTED** because the search in this case violated Defendant's right against unreasonable searches and seizures prohibited by the Fourth Amendment of the United Sates Constitution.  As a result, the handgun discovered in the search shall be suppressed.

**IT IS SO ORDERED**.


S/ARTHUR J. TARNOW
Arthur J. Tarnow
United States District Judge

Dated:  October 16, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 16, 2007, by electronic and/or ordinary mail.

S/THERESA E. TAYLOR
Case Manager